## GREEN v. PALFREYMAN.

No. 6845.   Decided February 14, 1946.   (166 P. 2d 215.)

See 5 C. J. S., Appeal and Error, sec. 1642; 12 Am. Jur., 1015.

*H. A. Sjostrom,* of Logan, for appellant.

*Christenson & Christenson,* of Provo, for respondent.

HOYT, District Judge.

This is a suit for an accounting. Most of the facts are not in dispute. Early in 1942 the United States Government was planning the construction of 2,000 dwelling units to relieve a housing shortage in the military and naval depot area adjacent to Ogden and Layton, Utah. A copartnership, Better Built Homes & Associates, which for convenience will hereinafter be referred to as "Better Built Homes," was negotiating for the contract. R. C. Green, the plaintiff in this case, and one J. D. Watson, contacted Better Built Homes with the purpose of obtaining a contract for the cement foundation work for these houses. Not having equipment or sufficient financial backing themselves to obtain

the contract they negotiated with the defendant, a contractor, to make a bid for the work in his own name, upon terms agreed upon between the three, and with the understanding that if the contract was obtained Green would act as superintendent of the work, Watson as engineer and the three would share in the profits after paying each of the three $10 per day for services rendered. Defendant was to receive fifty per cent of the profits and plaintiff and Watson each twenty-five per ecnt. On March 21, 1942, after some verbal negotiations with Better Built Homes, defendant submitted a bid in the form of a letter, Defendant's Exhibit 3, which recited that it was made "in confirmation of our verbal agreement of this date." In this bid defendant proposed to construct foundation piers for 2,000 houses, as per plans exhibited, at a price of $39 for each single house and $75 for each double house. The bid also proposed to construct step slabs four feet two inches by one foot three inches by four inches thick as per plan E-4, to be pre-cast if desired, at a price of $2 each. A few days later, on March 26, the defendant submitted to Better Built Homes another letter or bid, Plaintiff's Exhibit "O", in which he set out more particularly his bid relative to construction of concrete piers for 2,000 houses and fixed his price for such work at $36.12 for single houses and $70.38 for double houses. This bid contained no reference to step slabs. It was accepted by a brief endorsement in writing by Better Built Homes, with the recital that their contract with the United States government had not been completely negotiated and in case of such contract not being completed the acceptance of defendant's offer was not to be binding. It was also recited that when their contract with the United States government was completely negotiated a formal contract would be executed with defendant. Shortly after acceptance of this bid, the plaintiff together with J. D. Watson and the defendant met in Provo and went to the office of defendant's attorney and there had him prepare a "Memorandum of Agreement" which the parties then and there signed. In this agreement defendant was named as

first party and plaintiff and Watson second parties. This agreement (Exhibit "A", attached to plaintiff's complaint) recited that:

"First party has a contract of even date herewith with Better Built Homes and Associates, Inc., for building the foundations for two thousand houses in and near Ogden, Utah, and Second Parties hereby agree to work for First Party in connection with said contract upon the following terms and conditions:

"Second Parties shall devote their time and best efforts in the supervision and execution of said contract so as to insure the work of construction being carried on in an efficient manner under said contract, and each of the said Second Parties, respectively, J. D. Watson and R. C. Green, shall receive as compensation for their services the sum of $10.00 per day, payable semi-monthly and in addition thereto each of the Second Parties shall receive 25 per cent of the net profits, and the First Party shall receive 50 per cent of the net profits from said contract, after all wages, salaries, and expenses in the performance of said contract have been deducted, including the compensation to be allowed the First Party, as hereinabove set out.

"Said First Party shall also be allowed as compensation for his services in connection with said contract the sum of $10.00 per day, payable semi-monthly, it being understood that said First Party shall receive the same per diem as each of the said Second Parties, and such compensation allowed the First Party shall be deducted from the income from said contract before figuring the net profits for the purpose of distribution, as herein provided.

"It is further understood and agreed that a cost estimate will be set up by the parties hereto, and that no substantial expenditures shall be made in excess thereof without the consent of all the parties hereto, and it is further agreed that if the said Second Parties shall wilfully fail or refuse to use their best efforts in connection with the performance of said contract so that the work may be efficiently carried on, or shall wilfully fail to use due care, diligence, and good faith in the performance of their contract, said First Party shall have the right to terminate their services upon notice, and in which event said Second Parties shall be paid their full per diem compensation up to the time of the termination thereof but shall not be entitled to any further compensation."

The agreement also provided that the first party should furnish his equipment for performance of the contract for which rental should be paid at prevailing rates; that first party should receive his bond and insurance premiums, these items to be deducted before figuring net profits; that de-

fendant was to receive and bank moneys earned under the contract, pay expenses of operation, including per diem of the parties, then distribute the profits to the parties according to their respective interests.

The work of construction of the foundation piers was commenced in April or May, 1942. A formal contract, Plaintiff's Exhibit "F", covering construction of these piers, was executed between Better Built Homes and the defendant under date of July 14, 1942. This contract contained no mention of step slabs. It contained a recital "No other concrete work is included hereunder except the concrete piers listed above." The work on the foundation piers was completed in the early part of October. On October 8, Better Built Homes wrote a letter to defendant as follows:

"We hereby confirm our order to furnish and install concrete pads 16" x 48" x 4" thick under 2,000 porch steps in connection with the above projects; also pads 12" x 12" x 4" thick under those porch railing posts which extend to the ground at the front end of porch landings.

"The number of the 12" square pads to be determined by actual count when the work is completed.

"The above is an extra to your contract of July 14, 1942, and we agree to increase the price thereof by $2.00 for each of the 2,000 large pads and $.80 for each 12" square pad.

"Payment for the above to be as set forth in your contract mentioned above and all other terms of the contract to be unchanged, except that final payment under your original contract will not be held up pending completion of this extra work.

"Please acknowledge acceptance of the above on duplicate copy and return to us."

The defendant endorsed his acceptance upon this order as follows:

"We hereby accept the above this 15th day of October, 1942.
"B. D. Palfreyman."

Work upon these concrete pads or step slabs was commenced by the plaintiff and a crew of about seven laborers about the middle of October and was completed as to 400 houses at Layton and 200 houses on what is referred to as the Bonneville tract by October 28. The defendant testi-

fied that the plaintiff then abandoned the work and took employment with another contractor, Enoch Smith, taking his crew of laborers with him. The plaintiff testified that he did not abandon the work, but found that the ground was not graded or ready for placing the step slabs at the Washington Terrace part of the project where 1,400 houses were located, and that he took employment with Enoch Smith after consultation with the defendant in order to hold his crew of men together while waiting for the ground to be made ready for pouring the step slabs. The defendant denied that he had any conversation with plaintiff as to this and he contends that his contract with Better Built Homes permitted the pre-fabricating or pre-casting of the step slabs and that plaintiff did pre-fabricate fifty of them and then quit the work without notice to him. He testified that the first notice he had that plaintiff was not working on the step slabs was about November 23 when he visited the project and found plaintiff working for Enoch Smith.

Upon this controverted point the trial court found that without the consent and without any knowledge on the part of the defendant, the plaintiff discontinued the pre-fabricating and placing of the step slabs and removed the men that had been employed from defendant's job and entered into employment with Enoch Smith, taking the men with him. The trial court further found: That the bid made by the defendant for the step slabs was a part of the bid made by him in March for the concrete piers for the 2,000 houses, and was covered by the agreement entered into in April between the plaintiff and defendant and Watson. The court also found:

"That on or about August 23, 1943, at the request of said R. C. Green, plaintiff, and said J. D. Watson, and with their assistance, this defendant B. D. Palfreyman prepared and submitted another bid to the said Better Built Homes & Associates for the placing of street markers, clothes line poles and incinerators in connection with a portion of said 2000 homes and that said bid was submitted to the said Better Built Homes & Associates with the understanding and agreement between this defendant, B. D. Palfreyman, and the said plaintiff, R. C. Green, and J. D. Watson, that if and when the same was accepted by the

Better Built Homes & Associates the said work would be carried on upon the same terms and conditions and in accordance with the contract heretofore entered into between the said B. D. Palfreyman as the first party and R. C. Green and J. D. Watson as the second parties."

The court further found that prior to November 24, 1942, while the work of pre-fabricating the step slabs was uncompleted, the plaintiff, without any knowledge or notice given to defendant, entered into a contract for his own account with the Better Built Homes for a portion of the work covered by said bid of August 23, 1942; also that on November 24, 1942, the defendant at Provo prepared and mailed to the plaintiff a notice of termination of employment as follows:

"After my visit to Ogden yesterday, and in view of your having abandoned your employment by me in taking employment from other parties and wholly neglecting to carry on the work which you are expected to do upon my contract with the Better Built Homes Company, I have decided to terminate your employment, this to be in effect from the time you abandoned the job.

"You accepted other employment without any authority from or notice to me and abandoned the job that I expected you were performing, and, according to the information I obtained at Ogden, you intend to continue your employment on a job other than the one I hired you to carry out.

"You will, therefore, govern yourself accordingly."

The trial court concluded from the foregoing facts that the plaintiff's complaint should be dismissed and that defendant should have judgment against the plaintiff for $850 on account of advances made by defendant to plaintiff, prior to October 2, 1942, from profits earned upon the contract for piers. Judgment was rendered and entered according to such conclusions.

As grounds for reversal of the judgment, the plaintiff assigned numerous errors, most of which can be grouped under the following points:

(1) That the trial court erred in finding that the bid or contract for step slabs should be considered a part of the contract referred to in the agreement between Plafreyman,

Green and Watson; (2) that the court erred in finding that plaintiff abandoned the work on the step slab contract; (3) that the court erred in its conclusions that plaintiff forfeited his right to share in the profits on the contract for foundation piers even though it should be held that he abandoned the work on the step slabs; (4) that the court erred in giving consideration to defendant's bid made in August relating to concrete bases for street markers, incinerators, etc., and in holding that plaintiff violated his agreement with defendant when he made a bid on his own account for a portion of the work embraced in defendant's bid; (5) that the provision for forfeiture of plaintiff's share in the profits gives the defendant a right to a penalty and is therefore not maintainable in the courts.

Before disposing of these assignments, we should first decide as to the scope of our review of the trial court's proceedings. If the case is a suit in equity it is the duty of this court to weigh the evidence, and if convinced that there is a clear preponderance in plaintiff's favor on controlling points we should make our own findings and judgment or remand the case for further proceedings in the trial court.

It is said that an action for an accounting may be legal or equitable, depending upon the facts set out in the pleadings. Here the plaintiff alleges that the defendant reived all moneys earned under their agreement, kept the accounts, made all disbursements, and that the amount of receipts, disbursements and profits are within the knowledge of defendant and are unknown to plaintiff. This states a case for equitable jurisdiction (1 C. J. S., Accounting, §§ 33, 38, pp. 662, 668), and makes it the duty of this court to examine the evidence and determine its weight unless the case can be disposed of upon errors of law.

We are convinced from an examination of the evidence that the step slab contract should not be considered to be embraced in the contract which is referred to in the agreement executed in April, 1942, between Palfreyman, Green and Watson.

The bid which defendant made on March 21, in which the step slabs were referred to, was not the bid which Better Built Homes accepted. The written bid which was accepted on or about April 3 was the bid dated March 26 which contained no mention of step slabs. The subsequent formal contract executed in July likewise contained no mention of step slabs, and it contained the recital,

"No other concrete work is included hereunder except the concrete piers listed above."

The fact that there had been verbal negotiations in March between defendant and Better Built Homes relative to step slabs and that defendant had submitted a bid on such slabs in his letter of March 21 cannot be considered to establish a contract in view of the subsequent written bid and its written acceptance. Also, it is noted from the letter of J. D. Watson to defendant, Exhibit "L", dated September 22, 1942, that Watson then stated to defendant,

"Mr. Wilson has awarded us the job for the step slabs but says he will not know definitely about the yard work for at least two or three days."

This indicates rather clearly that the step slab contract was not awarded until long after April. We think the reasonable view is to look upon the step slab contract as a separate contract or an order for extra work under the contract for the piers.

It is rather clear, however, that when the order for the step slabs was accepted the plaintiff and defendant intended that the work should be carried on under the same arrangement for supervision and division of profits as that made for the work on the piers. Such being the case, the question remains to be answered whether the defendant can terminate the plaintiff's right to share in the profits earned under the contract for piers if it is found that plaintiff abandoned work on the step slabs.

We think he cannot. We can hardly believe that Green and Watson intended to agree that if they failed to use

their best efforts throughout the performance of the subsequent contract they would forfeit their right to share in profits earned on the first. Forfeitures are not favored, and in interpreting an agreement, every reasonable presumption should be indulged against an intention to allow a forfeiture. Also, where there has been a breach by one party of a severable part of a contract, the other party is not excused from performance of his promises relating to other parts of the contract. 17 C. J. S. Contracts, § 454, p. 935. We think here the contract relating to the step slabs should be looked upon as independent or at least severable from that relating to piers, and if there was a breach by plaintiff, it does not justify a forfeiture of his share of profits under the contract for piers.

We also think the contention of the plaintiff is reasonable that the bid made by defendant in August for construction of bases for flag poles, street markers, incinerators, etc., was not relevant to issues in this case. That work was rather obviously not in contemplation of the parties when they made their agreement in April. The fact that in August they collaborated in submitting a bid for this other work and agreed to carry it on upon the same terms as the work on the foundation piers, did not have the effect of incorporating it as an indivisible part of their original agreement. If, therefore, the plaintiff on his own account about November 24, made a bid to Better Built Homes for a portion of the work embraced in the August bid submitted by defendant, he should not for that reason be penalized by losing his share of profits earned upon the contract referred to in their April agreement. Also, it should be noted, that there is here no evidence that defendant's bid would have been accepted. The lapse of time between August 31 and November 24 indicates a probability that it had been rejected and that defendant suffered no detriment or damage by plaintiff's action. We therefore think it was error for the trial court to give weight to the evidence of the defendant's August bid and the plaintiff's subsequent

bid for a portion (if it can be identified as a portion) of the same work.

We now turn to the question of whether the trial court was justified in its finding that: ■

"On or about November 1, 1942, the plaintiff, without any just cause or excuse and in violation of his contract with the defendant, abandoned and suspended his employment under said contract with the defendant and that plaintiff wilfully failed and refused to carry on the work of the defendant efficiently as he had agreed to do."

We find in the record no evidence of a refusal on the part of plaintiff to proceed with the work nor any evidence of any demand, request or instruction from defendant for him to resume the work. Defendant testified that he had no knowledge that plaintiff had quit work on the step slabs until about the middle of November or later, yet it appears from the payrolls that both defendant and Watson were credited with being on the contract job nineteen days between November 1 and November 24, and that neither plaintiff nor any laborer was given credit for any day during the period. The defendant testified that he made several trips to Ogden between the 1st and 24th of November. If he made such trips or was on the job in any capacity it is hard to believe that he was unaware that plaintiff and the work crew were not at work on the step slabs. The plaintiff testified that he ceased work on the step slabs because the ground was not graded and ready. This appears plausible and it seems improbable that he would cease work and jeopardize his rights with defendant and their rights under the contract with Better Built Homes without some reasonable excuse. Plaintiff's testimony also seems to be clearly corroborated by defendant's letter to Better Built Homes, Exhibit "B" dated November 24, 1942, in which he stated:

"I desire to proceed with the completion of this job in the immediate future if the ground is properly graded and properly prepared for the placing of these step slabs, * * *. As you very well know, I have been delayed in this work for three weeks, at a time when the same could have been finished. It is imperative that this preparation of the ground be made at once."

The defendant in two other letters Exhibits "D" and "E" made reference to the ground not being prepared for pouring of the step slabs. A letter from Better Built Homes to defendant dated December 21, part of Exhibit "E", also contains a significant statement:

> "Your letter of November 24 expressed a willingness to be released from further performance under your contract, and in your previous verbal conversation with the writer which your letter confirms, you stated that you were very desirous of being relieved from pouring any more concrete pads under steps."

When due consideration is given to this documentary evidence and to the fact that no demand or request was made by defendant for plaintiff to resume work on the step slabs, we believe there is a clear preponderance of proof that the plaintiff did not wilfully fail or refuse to complete the work.

Having held that there was no breach of agreement by the plaintiff, it becomes unnecessary to rule on plaintiff's assignment that the provision for forfeiture must be considered as penalty and not a provision for liquidated damages. The case will be remanded with directions to the trial court to make findings as to the amount of profits earned on the contract for piers, and the profits, if any, on the order for step slabs. The trial court did not make findings on these matters and the record before us is not sufficiently complete for this court to make such findings. Permission should be given to reopen the case if further evidence is necessary to determine the amount of net profits. Findings and conclusions should be entered in conformity with this opinion and plaintiff should have judgment for one-fourth of the net profits as ascertained by the trial court. Costs to appellant.

LARSON, Chief Justice, and McDONOUGH, WADE, and WOLFE, JJ., concur.

TURNER, J., having disqualified himself, did not participate herein.